IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ELLIOTT HAINES, III,

   *Plaintiff,*

     v.

                           Civil Action No.: ELH-10-293

PATRICK A. DONAHOE,
POSTMASTER GENERAL OF THE
UNITED STATES,

   *Defendant.*

**MEMORANDUM OPINION**

Elliott Haines, III, plaintiff, has been an employee of the United States Postal Service ("USPS" or the "Postal Service") since approximately April 1999. *See* Complaint (ECF 1) ¶ 1. He filed an employment discrimination suit against Patrick R. Donahoe, Postmaster General of the United States, defendant, pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* (the "Rehabilitation Act"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"). In particular, plaintiff claims that he was subjected to a hostile work environment in retaliation for his Equal Employment Opportunity ("EEO") activity (Count I), and that he was subjected to gender discrimination, in that his claims of retaliatory harassment were not investigated as vigorously as claims of sexual harassment lodged by female employees (Count II). *See* Complaint.[1]

Plaintiff initially pursued his claims with the Equal Employment Opportunity Commission ("EEOC"), and an Administrative Law Judge held a multi-day evidentiary hearing in September 2007, after a period of comprehensive discovery. The Final Agency Decision,

---

[1] Plaintiff was self-represented at the time he filed his Complaint, but subsequently retained counsel. Counsel did not amend the Complaint, however.

issued in November 2007, found no discrimination.  Plaintiff's administrative appeal was denied

in August 2009, and his request for reconsideration was denied in November 2009.  This

litigation followed.

After additional discovery, defendant moved for summary judgment ("Motion" ECF 52).

In a consolidated submission, plaintiff filed a "counter-motion" for partial summary judgment

and an opposition to defendant's Motion ("Opposition," ECF 61), along with a supporting

memorandum ("Opposition Memo," ECF 62).[2]  Both parties have also submitted numerous

exhibits.  Indeed, the record consists of hundreds of pages of documentary evidence and

testimony.[3]  No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.

## Factual Background[4]

---

[2] I have also considered defendant's memorandum of law in support of the Motion, ("MSJ Memo," ECF 52-1), the combined opposition to the cross-motion and reply to plaintiff's opposition ("Reply," ECF 65), and plaintiff's reply in support of his cross-motion ("Surreply," ECF 68).

[3] Many of the exhibits, including deposition testimony, derive from the discovery conducted in connection with the EEOC investigation, as well as the EEOC hearing.  Several exhibits referred to in the Motion and the Opposition were provided with earlier submissions. However, all the exhibits are numbered consecutively.  I have noted both the exhibit number and the ECF number of the submission corresponding to each exhibit.

[4] In analyzing each summary judgment motion, the Court must construe the facts in the light most favorable to the non-moving party.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *accord Scott v. Harris*, 550 U.S. 372, 380 (2007).

Defendant's 42-page MSJ Memo includes a detailed statement of facts that largely comports with plaintiff's allegations in the Complaint.  Yet, despite obtaining four extensions of time to respond to the Motion (ECF 54, 56, 58, 60), plaintiff filed a seven-page submission that fails to include a statement of facts, citations to the record, relevant case law, or a response to the legal arguments raised in the Motion.  Although plaintiff appended to the Opposition, as plaintiff's Exhibit 2, "the statement of facts presented in the brief of Elliott Haines, III submitted to the EEOC Office of Federal Operations in Appeal No. 01A14096," that document addressed plaintiff's medical restrictions, and does not pertain to the events relevant to this suit.

In the Opposition Memo, plaintiff asserts that the MSJ Memo "is replete with assertions of fact that are plainly inconsistent with other, evidentiary competent portions of the record, or even with the very portion of the record that Defendant purports to rely."  Opposition Memo at 4.

In 1998, the USPS declined to hire plaintiff.  Complaint ¶ 8.  Claiming discrimination on the basis of "perceived disability," plaintiff filed a discrimination charge with the EEOC.  *Id*. Plaintiff ultimately began working for the Postal Service in 1999.  *Id.* ¶ 1.  And, on September 5, 2003, the EEOC's Office of Federal Operations ("OFO") issued a decision in plaintiff's favor (the "OFO decision").  *Id*. ¶ 8.  As a result, plaintiff was awarded "back pay" by the USPS.  *Id.* The USPS also had to post notice of the decision at USPS facilities.  *Id*.  Plaintiff avers that "a news release describing the OFO decision" appeared in "the newspaper published by the Frederick, MD, Local of the APWU (American Postal Workers Union)," which he "affirms…was widely read by employees" at "the Processing and Distribution Facility in Frederick, MD [the 'FPDF']." Opposition Memo at 2 n.3.[5]

In 2000, plaintiff filed an EEO informal complaint for race discrimination,[6] in connection with discipline imposed upon plaintiff by a supervisor, Kirk Stinette.  *See* ECF 15, defendant's Exh. 4, Sept. 26, 2007 Trans. of EEOC Hearing, Haines Test., at 43:17-44:21.  It was resolved

---

But, plaintiff fails to identify such inconsistencies.  In the Reply, defendant commented on the paucity of plaintiff's briefing.  After plaintiff obtained yet another extension of his briefing, *see* ECF 67, he responded with a nine-page surreply that failed to identify in the voluminous record the portions on which he would have the Court rely, failed to respond to most of defendant's legal arguments, and undertook only a cursory examination of relevant case law.

"'The court is not required to scour the record looking for factual disputes….'"  *Smith v. Vilsack*, 832 F. Supp. 2d 573, 580 (D. Md. 2011) (citation omitted).  *See also Muhammad v. Giant Food Inc.*, 108 F. App'x 757, 764 (4th Cir. 2004) ("[N]one of the employees' responses to the summary judgment motion specifically referred to any of the pattern-or-practice evidence or made any argument as to what that evidence might have established….Under these circumstances, we do not believe that the passing mention of a presumption in some of the employees' summary judgment responses sufficiently presented to the district court the issues the employees now press on appeal."); *Tatalovich v. City of Superior*, 904 F.2d 1135, 1139 (7th Cir. 1990) ("A district court need not scour the record to make the case of party who does nothing.").

[5] It does not appear that a copy of the newspaper has been made part of the record.

[6] The parties do not identify plaintiff's race in the briefing, nor cite to a portion of the record that reveals his race.  In any event, race is not an issue in this case.

through the "REDRESS" mediation process.  *Id*.  As a result of the negotiations, the discipline was rescinded.  *Id*.

From 2002 to 2003, plaintiff worked at the Main Post Office in Frederick, Maryland, where Warren Bickford, Jr. ("Bickford Jr.") was one of his supervisors.   Complaint ¶ 11. Bickford Jr. was unaware of plaintiff's prior EEO complaints.  *See* ECF 52, defendant's Exh. 17, Bickford Jr. Dep., Aug. 25, 2011, at 30:13-16.  During plaintiff's employment at the Main Post Office, Bickford Jr. observed plaintiff lifting an object, which Bickford Jr. believed to be a violation of medical restrictions to which plaintiff was subject.  *See id*. at 17:3-8.  As a result, plaintiff was issued a suspension.  After plaintiff pursued a union grievance, it was reduced to a warning.  *See id.* at 22:1; 23:4-7; 31:14-19.  No "EEO-type claims" were made in connection with the discipline.  ECF 15, defendant's Exh. 4, Sept. 26, 2007 Trans., Haines Test., at 31:7-32:3.

In the late summer or early fall of 2003, plaintiff was transferred to FPDF to work the night shift as a Small Parcel Bundle Sorter operator.  *See* Complaint ¶¶ 7, 16.  Warren Bickford, Sr. ("Bickford"), the father of Bickford Jr., was one of his co-workers there.  *Id.* ¶ 17.  Bickford also served as a part-time supervisor at FPDF in a position referred to as "204B."  *Id.*[7]   In plaintiff's view, Bickford filled the workplace with "negative energy," *see* ECF 15, defendant's Exh. 4, Sept. 26, 2007 Trans. of EEOC Hearing, Haines Test., 97:3-10, and Haines "didn't trust Mr. Bickford's word about anything."  *Id*. at 170:6-8.  According to Haines, Bickford "poison[ed] the work place atmosphere purposely to attempt to elevate his diminished ego."  *See* ECF 15, defendant's Exh. 7, EEO Investigative File, Haines Complaint of Apr. 4, 2004, at D-407.

_____

[7] This position is also referred to in the record as "204-B," "204b," and "204(b)."

Sharon Burd, one of plaintiff's supervisors at FPDF, observed that Bickford and plaintiff had a "personality conflict[]" and "didn't care for each other." *See* ECF 15, defendant's Exh. 3, Sept. 21, 2007 Trans. of EEOC Hearing, Burd Test., at 65:1-11. At the EEOC hearing, Bickford testified that Haines was insubordinate and "verbally insult[ed]" him. ECF 15, defendant's Exh. 1, Sept. 11, 2007 Trans. of EEOC Hearing, Bickford Test., at 240:3-4. He recalled that on one occasion, while Bickford was training a new employee, Haines said "Shut up, asshole" to Bickford. *Id.* at 241:13-22. Bickford believed plaintiff did not like him because plaintiff had been disciplined by Bickford Jr. *See id.* at 241:6-12 ("I never had a problem with Mr. Haines until after he worked for my son and my son disciplined him…I think there was a lot of resentment there.").

Bickford described Haines as lazy. At the EEOC hearing, he testified:

> A lot of people did not like working with [Haines]. He did not work. You ended up doing his part of the job. I would send him to work…and they'd come and say, "We're doing four trays an hour and he does two trays in eight hours. Don't send him back over here. He's impeding the operation….

ECF 15, defendant's Exh. 2, Sept. 12, 2007, Trans. of EEOC Hearing, Bickford Test., at 13:11-14:17.

Several co-workers of Haines and Bickford supported Bickford's account, attributing the conflict between Bickford and Haines to Haines's poor performance. Gail Amati, a co-worker, described plaintiff as "lazy," noting that during his night shift "he would fall asleep every night." *See* ECF 15, defendant's Exh. 7, EEO Investigative File, Amati Aff., at D-482. She claimed that Bickford told plaintiff "he had to do his job no matter what and Mr. Haines didn't do that." *Id.* In addition, Amati observed Bickford and plaintiff "arguing and having verbal altercations." *Id.* James Cooley, another co-worker, commented in his affidavit that Haines "is not much of a team player." *Id.* at D-486. He indicated that "Bickford may have had an attitude in dealing with"

5

Haines because Haines "was very lazy and wasn't doing his share of the work," and "[o]ther people had to basically clean up his mess." *Id.* In his view, "Mr. Bickford had the guts to speak up to him about it whereas other people were passive about it." *Id.* However, he never "witnessed Mr. Bickford treating Mr. Haines in a hostile manner." *Id.* Similarly, in her Affidavit, Susan Martinosi described Haines as "lazy." *Id.* at D-494. Supervisor Kevin Snowden described Bickford as a "tough cookie," who was "direct" towards employees who "weren't doing what he expected to be done." ECF 15, defendant's Exh. 2, Sept. 12, 2007, Trans. of EEOC Hearing, Snowden Test., at 67:1-16. But, he insisted that Haines was not singled out or targeted. *Id.* at 67:17-21.

Plaintiff points to a number of incidents involving Bickford in support of his claims.

According to Haines, in February 2004, as plaintiff and Bickford were working in a mail sorting area, Bickford threw a packet of mail into a bin, just missing plaintiff's head. *See* ECF 52, defendant's Exh. 18, Plaintiff's Responses to Defendant's First Requests for Admissions, No. 5. Plaintiff does not allege that Bickford threw the mail *at* him, however. *Id.* Bickford denied throwing mail at or near plaintiff. *See* ECF 15, defendant's Exh. 7, EEO Investigative File, Bickford Aff., at D-426.

In November 2004, Bickford told plaintiff to replace a "U-cart," a piece of postal equipment used to move mail, with another U-cart. Because Bickford was not serving as a supervisor at that time, plaintiff ignored Bickford's request. *See* ECF 15, defendant's Exh. 6, EEO Investigative File, Haines Complaint of Mar. 20, 2005, at D-155. Plaintiff then heard Bickford speaking with Mr. Snowden, the supervisor, asserting that plaintiff "should be on the

street." *Id.*[8]  Snowden recalled Bickford saying that "if Elliott wasn't going to follow directions, he should be put on the street." *See* ECF 15, defendant's Exh. 2, Sept. 12, 2007 Trans. of EEOC Hearing, Snowden Test., at 63:1-8.  Snowden explained that, while Bickford was not technically plaintiff's supervisor at the time he gave the instruction regarding the U-cart, plaintiff should have known that Bickford had been given temporary oversight for the building.  *See id.* at 64:1-4.  According to Snowden, the practice was to remove from the building any employee who did not follow instructions.  *Id.* 63:9-14.

On an unspecified date, plaintiff complained to Snowden that Bickford had disabled the console with which he was working.  *Id.* at 70:16-19.  Snowden explained that he did not pursue the matter because turning consoles on and off was routine, and it is easy to turn a disabled console back on, requiring just a "couple of [computer] mouse clicks." *Id.* at 71:7-10.

In February 2005, Bickford told plaintiff to move to another console because the one where he was working, "console #6," was broken.  *See* Complaint ¶ 21.  *See also* ECF 15, defendant's Exh. 7, EEOC Investigative File, Haines Aff., at D-389.  However, Bickford was not acting in a supervisory role at that time.  *Id.*  Because Haines did not believe that the console was broken, and thought that Bickford's order to switch consoles was Bickford's "way of harassing" him, *id.*, Haines asked Burd about the console.  *Id.*  Burd confirmed that plaintiff should not use console #6.  *Id.*  Plaintiff alleges that, when he returned to work, Bickford stated: "What I said wasn't good enough, dickhead?"  *Id.*  Plaintiff has cited another incident, without specifying a time or date, when Bickford questioned him "aggressively" about when he had "clocked in" to work, even though it was not clear that Bickford was acting as a supervisor at that time.

---

[8] In other parts of the record, this comment is recorded as "should be on the fucking street."

Complaint ¶ 22; ECF 15, defendant's Exh. 6, EEO Investigative File, Haines Complaint of Mar. 20, 2005, at D-155.

On March 19, 2005, as plaintiff was processing standard mail, Bickford told plaintiff to begin setting up to process priority mail. *See* ECF 15, defendant's Exh. 7, EEO Investigative File, Haines Aff., at D-390. Instead, plaintiff asked the supervisor, Lydia Carter-Reynolds, whether Bickford was acting as a supervisor; he did not ask Bickford. *Id.* Apparently, Bickford was not acting in a supervisory role at that time. *Id.* Plaintiff was "so outraged by Mr. Bickford's behavior" that he "took sick leave and went home." *Id.*

The next day, Bickford allegedly said "Fuck you, Elliot" as he walked by plaintiff. *Id.* at 392. Later that day, Bickford told plaintiff that he was scheduled for sweeping. *Id.* Plaintiff believed that another USPS employee, Juana,[9] had to sweep, as she was the last to arrive, and the practice was that the last to arrive was supposed to sweep. *Id.* Bickford allegedly told plaintiff: "[G]et your lazy ass up and sweep." *Id.* at 393. Because Bickford was not acting as a supervisor at that time, plaintiff ignored him. *Id.* Then, in a sarcastic manner, Bickford warned plaintiff "not to hurt himself" while plaintiff was sitting down. Complaint ¶ 29.

On April 4, 2004, plaintiff provided Carter-Reynolds with a written statement about Bickford's behavior. *See* ECF 15, defendant's Exh. 7, EEO Investigative File, Haines Complaint of Apr. 4, 2004, at D-406-07. He did not allege that the behavior was EEO related, however. *Id.* Carter-Reynolds met with plaintiff about "his issues with Mr. Bickford," and advised plaintiff to "ignore some of the things and to try to stay out of Mr. Bickford's way." *Id.* at D-442, Carter-Reynolds Aff. She told plaintiff that "if it got to the point where Mr. Bickford was harassing him we would do something about it." *Id.* She also instructed him to "write incidents down" for her

---

[9] Although Haines did not provide Juana's last name in his affidavit, it appears that he was referring to Juana Marquez.

to pass on to upper management. *Id.* Although plaintiff "thanked [Carter-Reynolds] for sitting down and talking with him," *id.*, he "never wrote down anything and gave it to [her]." *Id.*

Carter-Reynolds forwarded plaintiff's statement of April 4, 2004, to Kirk Stinette, who forwarded them to Burd. *See* ECF 15, defendant's Exh. 3, Sept. 21, 2007 Trans. of EEOC Hearing, Stinette Test., at 106:16-107:4. Burd was unable to verify the allegations because "she did not find any witnesses…so it was Mr. Haines' words against Mr. Bickford." *Id.* at 107:10-108-7. Haines also approached Stinette on one unspecified occasion with a complaint about Bickford, but Bickford denied the allegations. *See id.* at 113:13-114:4. Nevertheless, Stinette told Bickford that if the allegations were true, he "needed to cease and desist." *Id.*

On April 21, 2005, plaintiff was assigned to work for Bickford, but Burd requested that plaintiff work for her, instead. *See* ECF 15, defendant's Exh. 6, EEO Investigative File, Bickford Aff., at D-241. She asked plaintiff to perform manual duties, which plaintiff believed were in violation of his medical restrictions. Complaint ¶ 30.[10] Burd asked to see plaintiff's medical paperwork, but plaintiff had no documentation restricting his performance of the activities. *Id.* A similar incident occurred on May 4, 2005, but at that time plaintiff was able to provide documentation of his medical restrictions to the supervisor, Bill Henderson. *See* ECF 15, defendant's Exh. 6, EEO Investigative File, at D-213.

Plaintiff alleges that, on May 14, 2005, Bickford saw him "swipe in" at the time clock and, referring to plaintiff's medical restrictions, commented: "I thought you couldn't reach above your head, dickhead." Complaint ¶ 34. Later that day, Bickford "violently" opened a refrigerator door in the break room and said: "Watch out Elliot, you don't want to get hurt." *Id.* ¶ 35. Bickford then uttered the word "cocksucker" as he left the room. *Id.* Plaintiff complained

---

[10] The particularities of plaintiff's medical restrictions are not pertinent to the issues.

about the incident to Snowden. During the EEO investigation, Haines could not recall Snowden's response. *See* ECF 15, defendant's Exh. 7, EEO Investigative File, Haines Aff., at D-395. Burd became aware of the issue and investigated "by going to the maintenance supervisor," who told her "the refrigerator was very big and this sometimes happened." *Id.* at D-438, Burd Aff. She concluded that "Mr. Bickford didn't intend to hit or act like he was going to hit Mr. Haines." *Id.* As a result, "[n]othing else was done regarding the issue." *Id.*

Burd told plaintiff and Bickford that, although they had to work in the same area, they should sit apart and limit their interaction. *See* ECF 15, defendant's Exh. 3, Sept. 21, 2007 Trans. of EEOC Hearing, Burd Test., at 49:20-50:5. She told Bickford to "be professional. Come in do your job and be a professional." *Id.* at 50:7-11. Haines "complained that Mr. Bickford used profane language," but Burd observed that Haines "would use the same type of language as Mr. Bickford." *See* ECF 15, defendant's Exh. 7, EEO Investigative File, Burd Aff., at D-436. Haines did not indicate to Burd that his problems with Bickford were EEO related or retaliatory. *Id.* Rather, it "seemed like it was a personal reason that Mr. Haines didn't like Mr. Bickford," and he "did not like working for Mr. Bickford." *Id.*

The final incident occurred on May 15, 2005, when plaintiff began working at "console 6." *See id.* at D-398, Haines Aff. He "noticed that the seat at console six was wet and Mr. Bickford was watching [him] closely." *Id.* Haines reported the condition of the seat to Burd. *See* ECF 15, defendant's Exh. 4, Sept. 26, 2007 Trans. of EEOC Hearing, at 86:11-22. She told plaintiff to write a statement about what happened, and also spoke with Bickford. *Id.* Bickford told Burd that he had spilled a drink on the seat "accidentally," and had "tried to clean it up." *Id.* at 86:19-87:8. In plaintiff's view, the spill was not accidental. *Id.* at 86:9-10. He believed that Bickford had "directed" him to the wet seat by turning off the other consoles that were not being

operated, ensuring that he would operate the console with the wet seat.  *Id.* at 214:5-215:5.  He told Burd that "either Mr. Bickford had incontinence or, you know, needed Depends…."  *Id.* at 87:4-6.  Burd offered to meet with plaintiff and Bickford to discuss the incident, but plaintiff refused.  Complaint ¶ 40.  Burd also offered to "put [Haines] somewhere else to work," but plaintiff declined because he would still be "in proximity to" Bickford.  ECF 15, defendant's Exh. 7, EEO Investigative File, Haines Aff., at D-398.  Instead, he asked for paid administrative leave.  *Id.*  Plaintiff left work and did not return to work for the Postal Service for three years, at which time he took a position at a different facility.  Complaint ¶ 45.

On or about July 31, 2005, approximately six weeks after plaintiff's departure from FPDF, plaintiff, through his EEO representative, Glen Fallin, contacted "plant manager" James Uecker via email.[11]  ECF 52, defendant's Exh. 19, Uecker Dep., Mar. 9, 2007, at 39:15-21.  Uecker assumed the position of plant manager on February 1, 2005 and left the FPDF in November 2006.  *See* ECF 15, defendant's Exh. 1, Sept. 11, 2007 Trans. of EEOC Hearing, Uecker Test., at 124:11-20.  Thus, Uecker overlapped with plaintiff at FDPF from February 1, 2005, to May 15, 2005, but did not know Haines.  *See* Uecker Dep., 46:20 ("I never met the man.").

Fallin provided Uecker with a note from Dr. Ruth Gross, indicating that plaintiff was unable to return to work, due to stress.  *See* Uecker Dep., 38:24-39:21.  Fallin also mentioned the need for a "reasonable accommodation" to enable Haines to return to work.  *Id.* at 38:9-17.  Uecker informed Fallin that any request for accommodation would have to go to the "reasonable accommodation committee."  *Id.*  Plaintiff declined to participate in the interactive process conducted when an employee seeks a reasonable accommodation, as he did not assert that he had

---

[11] Uecker is frequently referred to in the record as "Jim."

a disability, a necessary predicate to receive an accommodation.  Complaint ¶ 56.[12]

Uecker informed Fallin that if plaintiff "had any EEO issues" he could file a complaint, as plaintiff's supervisors "were trained in how to handle [such] complaints." *Id.* at 12:1-8.  The record reflects that plaintiff's supervisors, including Bickford, received EEO training.  *See* ECF 15, defendant's Exh. 2, Sept. 12, 2007 Trans. of EEOC Hearing, at 26 (Bickford); ECF 15, defendant's Exh. 1, Sept. 11, 2007 Trans. of EEOC Hearing, 126:6-21 (Uecker); ECF 15, defendant's Exh. 3, Sept. 21, 2007 Trans. of EEOC Hearing, at 61:7-17 (Burd); *id.* at 189:7-191:18 (Stinette).  As a precautionary measure, Uecker instructed local management to cease using Bickford as a 204B supervisor pending resolution of the matter.  Uecker Dep., 71:3-12. However, Uecker observed, *id.* at 46:19-20: "Mr. Haines never came back to work, never brought an issue to me.  I never met the man."  Therefore, Uecker took no further action.  He reasoned, *id.* at 55:9-11: "I guess if Mr. Haines had come back to work, that would have prompted something on my part, where do we go from here?  But that never happened."

At the time Uecker invited plaintiff to pursue the EEO process, plaintiff had already commenced EEO action.  Indeed, plaintiff initially filed an EEO charge on November 8, 2004, which was amended several times to account for the incidents recounted above, as they unfolded. *See* Agency No. 1K-211-0076-04 (renumbered as 1K-211-0104-04).  EEOC investigator Loraine Della Porta was assigned to the case on September 12, 2005, approximately four months after the incident that precipitated plaintiff's departure from work.  *See* ECF 15, defendant's Exh. 6, EEO Investigative File, Letter Authorizing Della Porta Investigation, at D-289.

Uecker testified that he was unaware of the pending EEO charges during the time of plaintiff's employment.  *See* Uecker Dep., 13:12-21.  He explained that he had "never been an

---

[12] Plaintiff has not brought a claim alleging that he was denied a reasonable accommodation.  Nor did plaintiff raise such a claim during the administrative process.

active participant…in any EEO matter concerning—or raised by Mr. Haines," *id.* at 22:16-19, although he had participated in "two or three" EEO cases once they entered mediation.  *Id.* at 23:19-24:14.

Plaintiff avers that Kirk Stinette was informed of the charge and the amendments.  *See* ECF 15, defendant's Exh. 7, EEO Investigative File, Haines Aff., at D-388.  According to Haines, Stinette testified during the EEO investigation that he had received Haines's complaints, and had "forwarded all such documents to whoever was FPDF plant manager at the time each such document was received by him."  Plaintiff's Exh. 1, Haines Aff., ¶ 39.  As Uecker took over as FPDF plant manager in February 2005, plaintiff concludes that Uecker "received all of the written complaints transmitted…to the FPDF after February 1, 2005."  *Id.*[13]  However, Uecker testified that he never communicated with Stinette about Haines.  *See* Uecker Dep., 13:19-21.

---

[13] Unfortunately, plaintiff does not cite to record evidence indicating that Stinette so testified.  Instead, he relies on his own recollection.  The following portion of the "Investigative Affidavit" of Stinette, defendant's Exh. 7 at D-457, is relevant:

22. Do you recall receiving copies of letters Complainant Haines' representative submitted…on March 4, and 20, 2005, and May 8, 18, 20, and 30, 2005?

   **Yes.  I received copies of letters.**

23. What were the contents of the letters?

   **I don't recall.  I would have to get them from the file and review them. The letters involved the specifics of one of Mr. Haines' EEO cases.**

24. Do you recall if any of the letters dealt with his being harassed by Mr. Bickford?

   **I believe at least one of them did.**

25. If you received the foregoing letters, explain what action you took regarding the allegations stated in the letters.

   **I would not have taken any action because I was not on Tour 1 at the time.  I notified Plant Manager Jim Uecker that I received copies of the letters, and I believe he also received copies.**

26. Do you know whether Mr. Uecker took any action regarding the contents of the letters?

Bickford also testified that he was unaware of the pending EEO charges during the time of plaintiff's employment.  *See* ECF 15, defendant's Exh. 2, Sept. 12, 2007 Trans. of EEOC Hearing, Bickford Test. at 7-9, 42.  Rather, Bickford first learned of plaintiff's charge when he was approached by the EEOC investigator, Loraine Della Porta.  *Id*.[14]  In his affidavit, plaintiff posits that Bickford may have learned earlier of his EEO activity.  *See* plaintiff's Exhibit 1, Haines Affidavit.  In support of this assertion, plaintiff notes that Bickford once made a "sarcastic comment" about EEO complaints in front of him, *id*. ¶ 14, and suggests that Bickford may have seen a newspaper article about the OFO decision.  *Id*. ¶ 15.

Plaintiff complains that, in violation of a "zero tolerance policy"[15] concerning harassment, Uecker failed to curb Bickford's harassment of plaintiff in order to punish plaintiff for his EEO activity.  Complaint ¶¶ 50, 55.  Plaintiff also alleges that, in contrast to his situation, complaints of harassment made by female USPS workers were responded to "promptly and vigorously."  *Id*. ¶ 61.  Therefore, I pause to examine the female comparators to whom plaintiff refers.

The first comparator is Lisa Young, a female Postal Service worker who filed an EEO complaint in 2003 regarding unwanted advances from a male USPS employee.  *See* Complaint at

---

**I'm not sure.**

[14] In his testimony at the EEOC hearing, Bickford expressed uncertainty about the *date* on which he learned of plaintiff's EEO charge.  *See* ECF 15, defendant's Exh. 2, Sept. 12, 2007 Trans. of EEOC Hearing, at 8 ("I'm thinking–and I am not sure–probably 2004.  Around 2004").  However, he was unequivocal that he was put on notice of plaintiff's charge by Della Porta.  *Id*. at 7 (when "Della Cruz" asked Bickford some questions "she mentioned…an EEO complaint and that was the first time I became aware of an EO[sic]"); *id*. at 8-9 ("Q: Do you know if Della Cruz and Della Porta is the same person?"  "A: Yes, Your Honor."); *id*. at 42 ("Q: When did you first become aware that Mr. Haines had filed an EEO case–started an EEO case in this case?"  "A: I believe it was when I talked to Della Cruz or Della Porta.").

[15] Plaintiff refers repeatedly to a "zero tolerance policy" but does not particularize the policy or point to a copy of such a policy in the record.  In the depositions, questions about such a policy seemed to concern sexual harassment, about which plaintiff has not complained.

¶ 62.   In particular, she complained that a co-worker, "Charlie," who had been in treatment for cancer, told her that he was "getting back his sexual urges" and that if she "was a good friend, [she] would help him see if everything was still working right."   *See* ECF 52, defendant's Exh. 22, Sexual Harassment Complaint Form, at 1.   The same co-worker asked for Young's cellular phone number "numerous times," and asked if she "need[ed] help in the bathroom."   *Id.* at 3.   In response to her complaints, Young was moved to a different shift, or "tour," which entailed a change from her "bid position."   *See* ECF 15, defendant's Exh. 14, Deposition of Dora Everett, Young's Union Representative, at 20:6-10.[16]

The investigation and informal resolution of Young's complaints occurred prior to Uecker's arrival in November 2005.   Uecker was unaware of the resolution that had been reached and, after becoming plant manager, sought to return Young to her bid position.   *Id.* at 20:15-18.   Young protested, assisted by Union Representative Dora Everett, who informed Uecker that he could not do so because Uecker's predecessor had promised Young the reassignment.   The dispute was ultimately resolved via mediation, with Young retaining her new position.   *Id.*; *see also* ECF 52, defendant's Exh. 19, Uecker Dep., at 29:22-24, 34:19-35:7.   The following deposition testimony of Uecker is relevant, *id.* at 41:1-18:

> Q:  Did you ever contemplate, if and when Mr. Haines returned to work, he would not be required to work with Mr. Bickford?
>
> A:  That wouldn't be something that I would leap to very easily.  This is a small facility, and I can't insure that anyone wouldn't come in contact with somebody else.  And it is not my normal routine to try to separate people, but rather to deal with the problem.
>
> Q:  Well, did you not try to separate Ms. Young from a male employee?
>
> A.  No, I didn't.

---

[16] This was not the first complaint involving "Charlie."  He had previously asked another co-worker to "exchange bodily fluids," put his hands on her buttocks, and refused to refrain from engaging with her even when instructed not to, resulting in a suspension after he failed to deny the allegations. *See* ECF 52, defendant's Exh. 23, Notice of Suspension.

Q.  Okay, was that not the result of—

A:  Actually, it was my trying to put them back on the same tour [i.e., shift] that caused the issue.

Cynthia Wingate-Neal, a USPS employee, is the other alleged comparator.  Wingate-Neal filed a formal EEO complaint in June 2006, alleging inappropriate remarks by her supervisor, Paul Anderson.  *See* ECF 52, defendant's Exh. 21, Wingate-Neal Dismissal, at D000006.  She alleged, *inter alia*, that Anderson "made comments to her about zipping up her jacket because he was trying to get work done," stared at her, and required her to work in the same area where he worked.  *Id.*  The complaint was dismissed that same month because the EEOC believed that Wingate-Neal's complaint failed to demonstrate that she had suffered an adverse employment action due to the alleged harassment.  *Id.* at D000007.  Uecker's role in the case was that he was informed an EEO investigation was ongoing, and ensured that witnesses were available to participate in the investigation.  *See* ECF 52, defendant's Exh. 20, Deposition of Beverly Eckels,[17] USPS Workplace Environment Analyst, June 20, 2007, 70:5-15.

It is undisputed that neither Young nor Wingate-Neal had the same supervisors as Haines. And, neither woman complained of interactions with Bickford.

In response to the charge Haines filed with the EEOC, as amended, two investigations were completed, one on November 16, 2005, and the other on January 11, 2007.[18]  After the investigations were completed, plaintiff requested an administrative hearing.  Administrative

---

[17]  Eckels's name also appears in the record as "Eckles."

[18]  The investigative files are part of the record.  However, I have not uncovered the reason for multiple investigations.

Law Judge ("ALJ") David Norken held a multi-day evidentiary hearing in September 2007.[19] *See* ECF 15, defendant's Exh. 6, EEO Investigative File, at D-002.

In his ruling from the bench on September 28, 2007, the ALJ dismissed plaintiff's claims. *See* ECF 15, defendant's Exh. 5, ALJ's Decision.  The ALJ found, *inter alia*, that the USPS had responded appropriately to Haines's complaints about Bickford, *id.* at 0030; that Bickford did not retaliate against Haines for his EEO activity, *id.* at 0036-37; that Haines was not subject to a hostile work environment, *id.* at 0037; and that Haines and Young were not similarly situated. *Id.* at 0041.[20]  The ALJ concluded that Haines "failed to establish that he was discriminated against on the basis of…sex and reprisal concerning his allegations of harassment." *Id.* at 0042-43.

A Final Agency Decision was issued on November 16, 2007, finding no discrimination. *See* ECF 15, defendant's Exh. 11, Final Agency Decision.  On December 19, 2007, plaintiff timely appealed to the OFO, which denied the appeal on August 27, 2009.  *See* ECF 15, defendant's Exh. 12, OFO Decision.  Haines then filed a request for reconsideration, which was denied by the OFO on November 5, 2009.  *See* ECF 15, defendant's Exh. 13, OFO Reconsideration Decision.  This suit followed, on February 4, 2010.  *See* ECF 1.

Additional facts will be included in the Discussion.

## Standard of Review

As noted, both parties have moved for summary judgment under Fed. R. Civ. P. 56. Summary judgment is properly granted only if the movant shows that "'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting former Fed. R. Civ. P. 56(c)).

---

[19] Hearings were held on September 11, 12, 21, and 26.

[20] In his opinion, the ALJ did not discuss Wingate-Neal as a potential comparator.

Conversely, the nonmoving party must demonstrate that there are disputes of material fact so as to preclude the entry of judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A "party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts'" showing that there is a dispute of material facts. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322-24. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving the motion, the Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott*, *supra*, 550 U.S. at 378. When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 822 (2003). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson, supra*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict" for the nonmoving party, there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

The parties rely primarily on the voluminous record developed at the administrative stage, as supplemented during discovery in this court. Plaintiff's administrative claims are reviewed de novo. *See Scott-Brown v. Cohen*, 220 F. Supp. 2d 504, 506 (D. Md. 2002). *See also Chancey v. N. Am. Trade Sch.*, No. 10–0032, 2010 WL 4781306, *3 (D. Md. Nov. 17, 2010)

("Because federal district courts review discrimination claims *de novo,* the EEOC findings are 'immaterial to [plaintiff's] causes of action.'") (citation omitted).

## Discussion

### Count I

Plaintiff alleges that he was subjected to a hostile work environment based on unlawful retaliation, invoking the Rehabilitation Act,[21] 29 U.S.C. § 701 *et seq.* Federal anti-discrimination statutes contain anti-retaliation provisions in order to "[m]aintain[ ] unfettered access to statutory remedial mechanisms" for employees who fear reprisal. *Robinson v. Shell Oil Co.,* 519 U.S. 337, 346 (1997).

The standards used to determine whether a federal employer has discriminated under the Rehabilitation Act are those set forth under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.* The Rehabilitation Act incorporates the ADA's anti-retaliation provision, which is substantially identical to Title VII's anti-retaliation provision, and bars retaliation against employees who have "opposed any act or practice made unlawful by [the ADA or the Rehabilitation Act] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." *See* 42 U.S.C. § 12203(a).

A plaintiff who lacks direct evidence of discrimination may proceed under the burden shifting approach popularly known as the *McDonnell Douglas* proof scheme. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[22] An employee who proceeds under the

---

[21] Presumably, plaintiff invoked the Rehabilitation Act because he believes the alleged retaliation was in response to his previous allegations against the USPS of discrimination on the basis of perceived disability.

[22] *McDonnell Douglas* involved a claim under Title VII. However, the burden-shifting methodology endorsed by *McDonnell Douglas* has been adapted for use with claims invoking the ADA and the Rehabilitation Act. *See, e.g.*, *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 & n.3 (2003) (ADA); *Hooven-Lewis v. Caldera*, 249 F.3d 259, 266-68 (4th Cir. 2001)

*McDonnell Douglas* approach must first establish a "prima facie case of discrimination." *Merritt*

*v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).  If the plaintiff establishes

a prima facie case, "a presumption of illegal discrimination arises, and the burden of production

shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for the

conduct complained of.  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).  When

the defendant meets his burden, the plaintiff must then prove, by a preponderance of the

evidence, "that the proffered reason was not the true reason," and that the plaintiff "has been the

victim of intentional discrimination."  *See Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248,

256 (1981).

As noted, Haines was self-represented at the outset of this case.  In essence, he has

lodged a hybrid discrimination claim: the retaliatory adverse employment action of which he

complains is that Uecker permitted Bickford to subject Haines to a hostile work environment.

*See Von Gunten v. Maryland,* 243 F.3d 858, 869 (4th Cir. 2001) ("Retaliatory harassment can

constitute adverse employment action."), *overruled on other grounds by Burlington Northern*

*and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

To establish a claim for retaliation, the plaintiff must show that: (1) he engaged in

protected activity; (2) the defendant took a material adverse employment action against him; and

(3) that a causal connection existed between the protected activity and the adverse action.  *See A*

*Society Without A Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011) (outlining the elements in

the ADA context).

"In order to establish a hostile work environment claim, a claimant must demonstrate that

the alleged conduct: 1) was unwelcome; 2) resulted because of…gender, disability, or prior

---

(Rehabilitation Act).

protected activity; 3) was 'sufficiently severe or pervasive' to alter the conditions of [his] employment; and 4) was imputable to [his] employer." *Pueschel v. Peters*, 577 F.3d 558, 564-65 (4th Cir. 2009) (quoting *Ocheltree v. Scollon Prods., Inc.,* 335 F.3d 325, 338 (4th Cir. 2003)).

As to the claim of retaliation, it is undisputed that plaintiff's EEO activity constituted a protected activity. The Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *EEOC v. Navy Federal Credit Union,* 424 F.3d 397, 406 (4th Cir. 2005), *cert. denied,* 547 U.S. 1041 (2006). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding…, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metropolitan Washington Airports Authority,* 149 F.3d 253, 259 (4th Cir. 1998).

With respect to the second element of a retaliation claim, an adverse employment action is one that "'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Wash. Homes, Inc.,* 487 F.3d 208, 219 (4th Cir.2007) (alteration in original) (citation omitted). A plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington, supra*, 548 U.S. at 68 (internal quotation marks omitted).

Given the hybrid allegations, I will analyze Haines's claim in Count I under the framework of a hostile work environment claim, which also encompasses the second and third elements of a retaliation claim: whether plaintiff was subjected to an adverse action, and whether a causal connection existed between the protected activity and the adverse action. *See Society Without A Name, supra*, 655 F.3d at 350; *see also Dowe v. Total Action Against Poverty in*

*Roanoke Valley,* 145 F.3d 653, 657 (4th Cir. 1998) ("[T]he employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity.") (Emphasis in original).

Plaintiff asserts in the Complaint, at ¶ 57:

> At all pertinent times, the USPS professed to adhere to a 'zero tolerance' policy with regard to harassment or bullying behavior toward its employees. On information and belief, that policy was adhered to except when the victim of such harassment or bullying was an employee, such as Plaintiff, who had engaged in protected EEO activity.

In order for plaintiff to prove that he was subjected to a retaliatory, hostile work environment, as he alleges, plaintiff must show that he was subjected to a hostile work environment, and that it "resulted because of…[his] prior protected activity." *Pueschel*, *supra*, 577 F.3d at 565. Put another way, if plaintiff is able to establish a prima facie case that he was subjected to a hostile work environment, he also will have established a prima facie case that he was subjected to retaliation.

In moving for summary judgment as to Count I, defendant argues that plaintiff failed to demonstrate that he was subjected to a hostile work environment; failed to produce any evidence of retaliatory animus; and cannot establish a basis pursuant to which the alleged harassment can be attributed to the USPS. *See* Motion at 1.

In his Opposition Memo, plaintiff failed to respond to these arguments. Indeed, he posited four arguments, all of which are generally non-responsive to defendant's contentions. First, plaintiff contends that defendant failed to show the "absence of a genuine issue concerning any material fact." *Id.* at 5. Yet, plaintiff does not point to any material disputes of fact. Second, plaintiff argues that he is entitled to an "adverse inference" that, contrary to Uecker's assertion, Uecker did, indeed, receive Haines's various complaint letters. *Id.* Third, plaintiff

maintains that defendant's explanations for Uecker's actions were pretextual as a matter of law, because "Mr. Uecker's excuse for inaction" was "implausib[le]." *Id.* at 5-6. But, plaintiff does not explain why it is implausible that Uecker's action (or inaction) was prompted by non-discriminatory concerns. Fourth, in a single sentence, plaintiff characterizes as "misplaced" one of defendant's arguments about EEO investigations, discussed *infra* with respect to Count II. *Id.* at 6-7.

It is difficult to decipher the grounds on which plaintiff seeks summary judgment. In a boilerplate manner, plaintiff states that he seeks "a determination that undisputed facts entitle Plaintiff to a determination of Defendant's liability based on his failure to proffer a legitimate and nondiscriminatory and/or nonretaliatory explanation for the adverse treatment complained of...." Opposition Memo at 1. But, plaintiff does not argue that he has established all of the other requisite factors. In my view, no reasonable jury could find that Uecker permitted or fostered a hostile work environment in order to retaliate against plaintiff for engaging in EEO activity. I turn to defendant's summary judgment motion.

To be sure, Bickford's conduct was unwelcome. But, in assessing whether Bickford's conduct was sufficiently severe and pervasive so as to trigger liability, the Court must "look to the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Okoli v. City Of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (citations and internal quotation marks omitted). Notably, "[t]his element of a hostile work environment claim has both subjective and objective components." *E.E.O.C. v. Central Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009) (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-23 (1993)). A plaintiff must show that he "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." *Central Wholesalers*, 573 F.3d at 175. Put another way, it is not sufficient that Haines was

traumatized by Bickford's conduct; a jury must be able to find that a *reasonable person* would have found the harassment so severe and pervasive as to alter the terms and conditions of employment.

Essentially, plaintiff complains that Bickford, a "tough cookie," gave directives when he was not empowered to act as a supervisor, which he apparently was known to do to workers other than Haines.  He used profanity, as did Haines.  In the light most favorable to plaintiff, Bickford committed essentially immature, inappropriate, yet benign acts, such as throwing a mail bundle into a bin, near plaintiff; purposefully spilling water on plaintiff's seat; turning off a console; and forcefully opening a refrigerator door in the vicinity of plaintiff.  Even if Haines correctly ascribed ill will to Bickford's sporadic conduct, the childish acts were not emblematic of a pervasively hostile work environment.  Nor has Haines presented evidence that the alleged conduct interfered with his work performance.

"Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace."  *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 754 (4th Cir. 1996).  Moreover, "a hostile work environment [can] amount to actionable retaliation, but only if 'it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Thorn v. Sebelius,* 766 F.Supp.2d 585, 600 (D.Md.2011) (citations omitted). Bickford's alleged harassment clearly had no such dissuasive effect on Haines, who actively complained about Bickford and pursued EEO remedies.

With respect to Bickford, defendant also argues: "Plaintiff fails to demonstrate that any of the actions by Bickford, even if true, were taken against him unlawfully as retaliation for previous EEO activity."  MSJ Memo at 27.  Indeed, plaintiff "makes no allegation that Bickford (or anyone else) ever used derogatory epithets or remarks related to Plaintiff's current or past

EEO activity." *Id.*   Even assuming, *arguendo,* that plaintiff *was* subjected to unwelcome harassment that was so severe and pervasive as to alter the terms and conditions of his employment, no reasonable jury could find that the harassment "resulted because of…[his] prior protected activity." *Pueschel*, *supra,* 577 F.3d at 565.   In other words, plaintiff simply cannot demonstrate that the allegedly hostile work environment was motivated by or permitted to continue due to retaliatory animus.

To the contrary, there is ample, undisputed evidence that the two men had a mutual dislike and a "personality conflict."   Furthermore, "by definition, an employer cannot take action because of a factor of which it is unaware, [and so] the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish [retaliation]." *Dowe, supra,* 145 F.3d at 657.[23]   At the time of the alleged harassment, Bickford was unaware that plaintiff had filed an EEO complaint involving Bickford.   As discussed, *supra,* Bickford did not become aware of the complaint until informed by Della Porta, months after Haines's departure from the FPDF.   Nor has plaintiff offered any evidence that Bickford knew of the OFO decision in Haines's favor.   Rather, Haines merely notes that an article about the decision was published in a newspaper, baldly speculating that Bickford may have seen it.

Nor has plaintiff demonstrated that, even if the allegedly hostile work environment was not *prompted* by retaliatory motivation on the part of Bickford, it was permitted to *continue* due

---

[23] To the extent that Bickford knew of the union grievance that plaintiff had filed against Bickford Jr., retaliation on the basis of the union grievance would not be actionable under the ADA.   The ADA prohibits retaliation on the basis of opposition or participation implicating the ADA, not collective bargaining agreements.   *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful *by this chapter* or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing *under this chapter.*") (emphasis added).

to retaliatory motivation on the part of Uecker.[24]   Haines has not alleged that Uecker ever used derogatory epithets or remarks regarding plaintiff's then-current or prior EEO activity.   In fact, Uecker and Haines never interacted.   *See* Uecker Dep., 46:20 ("I never met the man.").

Uecker testified that it was "not [his] normal routine to try to separate people, but rather to deal with the problem."   Uecker Dep., 42:10-18.   Plaintiff has not shown that Uecker's failure to separate plaintiff and Bickford, or to enforce the alleged "zero tolerance policy," if any, was discriminatory.   Simply put, even if plaintiff could show that Uecker's response to the interpersonal problems between Haines and Bickford was inadequate, or at odds with USPS policy, he has not shown that Uecker's response was fueled by a retaliatory motive.   *See Vaughan v. Metrahealth Companies, Inc.,* 145 F.3d 197, 203 (4th Cir. 1998) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent....Federal courts cannot ensure that business decisions are always informed or even methodical.") (citation and internal quotation omitted).   Moreover, despite substantial discovery, Haines has not produced *any* comparators to demonstrate that his conflict with Bickford was treated differently than a similar conflict complained of by another employee who had not engaged in protected activity.[25]

---

[24] Defendant states: "The alleged discriminatory official in this case is Bickford...."   MSJ Memo at 28.   That was surely true during the administrative proceedings.   But, the Complaint, at ¶ 55, makes clear that, in the case at bar, plaintiff has chosen to base his claims on the actions and motivation of Uecker, not Bickford.   *See also* Surreply at 2 n.2 ("Plaintiff's claims rest upon the actions and omissions of FPDF management, particularly Plant Manager James Uecker....").   This is potentially due to the fact that the ALJ found that Bickford was unaware of plaintiff's EEO activity, but that Uecker *was* on notice of that activity, although the ALJ did not find that Uecker acted with retaliatory animus.   *See* ECF 15, defendant's Exh. 5, ALJ's Decision, at 0029.

[25] As discussed in detail, *infra*, Young and Wingate-Neal are not appropriate comparators with respect to Count II.   But, even if they were appropriate comparators, they cannot serve as comparators in the context of Count I, because they had engaged in protected activity.

As I see it, no reasonable jury could find that plaintiff was subjected to unwelcome harassment that was so severe and pervasive as to alter the terms and conditions of his employment.  Nor can plaintiff demonstrate that the hostile work environment to which he was allegedly subjected was motivated by retaliatory animus.  Because a reasonable jury could not find that plaintiff established a prima facie case of hostile work environment or retaliation, defendant is entitled to summary judgment as to Count I.[26]

*Count II*

In Count II, plaintiff alleges: "But for Plaintiff's gender, male, his complaints would have been promptly and effectively investigated and resolved, and Plaintiff would not have suffered the harms described herein."  *See* Complaint ¶ 64.

To establish a prima facie case of gender discrimination, the plaintiff must establish the following: "(1) membership in a protected class; (2) satisfactory job performance; (3) subjection to an adverse employment action; and (4) demonstration that similarly situated employees outside the protected class received more favorable treatment."  *Westmoreland v. Prince George's Cnty.*, No. 09–CV–2453, 2011 WL 3880422, *4 (D. Md. Aug. 31, 2011) (citing *Prince–Garrison v. Md. Dep't of Health and Mental Hygiene,* 317 F. App'x 351, 353 (4th Cir. 2009); *Holland v. Wash. Homes, Inc.,* 487 F.3d 208, 214 (4th Cir. 2007)).  "A modified prima facie case under the *McDonnell Douglas* framework applies to disparate treatment claims based on a failure to investigate."  *Westmoreland*, 2011 WL 3880422 at *4.

In moving for summary judgment as to Count II, defendant argues that plaintiff cannot, as a matter of law, bring a discrimination claim about the "way EEO investigations proceed"; the alleged misconduct does not constitute an adverse employment action; plaintiff has failed to

---

[26] Because I find that defendant is not liable as to Count I, I need not address whether there is any basis for imputing liability to USPS.

produce any evidence of gender-based animus; and plaintiff cannot show that the stated reasons for defendant's response to plaintiff's complaints were pretextual.  *See* Motion at 1-2.  As indicated, plaintiff did not respond directly to these arguments, other than to insist that Uecker's given reasons for his actions were pretextual, and to assert, with a single sentence of elaboration, that defendant's argument about the "way EEO investigations proceed" is "misplaced."

Preliminarily, defendant insists that a "'complaint about the EEO process itself, cannot form the basis of a Title VII or ADEA claim.'"  MSJ Memo at 33 (quoting *Stoyanov v. Mabus*, No. No. 07–1863, 2011 WL 4397492, *13 (D. Md. Sept. 20, 2011)).  Put another way, defendant argues that "Title VII 'does not create an *independent* cause of action for the mishandling of an employee's discrimination complaints.'"  MSJ Memo at 33-34 (quoting *Nelson v. Greenspan*, 163 F. Supp. 2d 12, 18 (D.D.C. 2001)).  Rather, defendant claims that the "sole remedy for dissatisfaction with the either [sic] the EEO office, the EEOC, or how Agency management handles or investigates complaint [sic] is through the de novo review process in district court."  MSJ Memo at 34.

Plaintiff argues, without citing any authority, that this argument is "misplaced" because "Plaintiff has made clear that his complaints have nothing to do with the processing of his EEO charge, but with the failure of management to provide any relief for an intolerable situation…."  Opposition Memo at 6-7.

The thrust of plaintiff's claim in Count II is that Uecker failed to respond to Haines's concerns about Bickford "promptly and effectively" because Haines is a man.  *See* Complaint ¶ 64.  By the time Uecker became plant manager at FPDF, an EEO investigation of plaintiff's claims was already well underway.  It is unclear that Uecker's actions can really be considered outside the context of the EEO investigation.  As defendant argues, "the EEO process is the tool

available to agencies to investigate complaints of discrimination."  Reply at 11 (citing 29 C.F.R. § 1615.102).

In any event, plaintiff cannot establish a prima facie case of gender discrimination.  As a man, plaintiff is a member of a protected class.  *See Hopkins, supra,* 77 F.3d at 749-50 ("While Congress' particular focus in amending Title VII to prohibit discrimination on the basis of 'sex' was to ensure equal employment rights for women, the Supreme Court has interpreted the Act's broad language to protect both men and women.") (citing *Newport News Shipbuilding and Dry Dock Co. v. EEOC,* 462 U.S. 669, 676 (1983)).  Although defendant comments on Bickford's perception of Haines as "lazy," he does not explicitly argue that, for the purpose of establishing a prima facie case, plaintiff failed to demonstrate his satisfactory job performance.  Further, I assume, *arguendo,* that Uecker's action (or inaction) constituted an adverse employment action, although this point is disputed by defendant.  MSJ Memo at 39 ("Generally, initiation of investigations, without them resulting in a particular employment consequence, are insufficient to demonstrate an adverse action.") (citing *Simmington v. Gates,* No. 08–3169, 2010 WL 1346462, *13 (D. Md. Mar. 30, 2010)).  Nevertheless, it is abundantly clear that plaintiff cannot demonstrate "that similarly situated employees outside the protected class received more favorable treatment" than he. *Westmoreland, supra,* 2011 WL 3880422 at *4.

In order for Young and Wingate-Neal to serve as appropriate comparators, plaintiff must show that they were similarly situated to him in all "relevant respects."  *Haywood v. Locke,* 387 F. App'x 355, 359 (4th Cir. 2010).  "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and...engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Id.* (quoting *Mitchell v. Toledo Hospital,*

964 F.2d 577, 583 (6th Cir. 1992)).

This simply is not the case. Neither Young nor Wingate-Neal, the alleged comparators, had the same supervisors as plaintiff had. So, plaintiff's complaints about management's response to Bickford's claims of harassment are unavailing. Uecker, the FPDF plant manager, served in that position for only a brief portion of the time during which Bickford allegedly harassed Haines. Yet, plaintiff has only alleged that Uecker, not Uecker's predecessors, permitted the harassment to continue out of retaliatory animus, despite the fact that the alleged harassment had been ongoing for an extended period of time before Uecker came to FPDF. Nor was Uecker responsible for the more favorable outcome of Young's case.[27] To the contrary, the parties in that matter proceeded to mediation, because Uecker was *opposed* to Young's transfer, which had been arranged by a predecessor.

Moreover, the incidents of which Haines complained were not similar to Young's complaints; unlike Young, plaintiff did not allege that he was subjected to sexual harassment. Thus, the conduct in issue was wholly distinct. Plaintiff concedes that there is no evidence that Bickford made comments to female employees similar to those he made to plaintiff, but which were investigated more vigorously. *See* ECF 52, defendant's Exh. 18, Plaintiff's Responses to Defendant's First Requests for Admissions, No. 23 ("Request No. 23. There is no evidence Warren E. Bickford, Sr., made comments or directed actions to female employees that the agency investigated more vigorously than Plaintiff's allegations." "RESPONSE: ADMITTED."). *See also* ECF 15, defendant's Exh. 5, ALJ's Decision, at 0042 ("Complainant has not offered any evidence to show that Bickford didn't direct this kind of conduct or these

---

[27] As the ALJ aptly noted, Uecker is "the only individual that is a lynchpin for comparison," as he "made decisions about investigating both cases," *i.e.*, Young's and plaintiff's. *See* ECF 15, defendant's Exh. 5, ALJ's Decision, at 0041.

kinds of words towards females, as well.").

Further, to the extent that plaintiff's claims sprout from the EEO process itself, plaintiff surely was not afforded process inferior to that provided to Young and Wingate-Neal.  Young's complaints were resolved through mediation, and Wingate-Neal's were promptly dismissed. Yet, plaintiff received the benefit of two exhaustive EEO investigations; substantial discovery, including numerous depositions; and a four-day administrative hearing, followed by an appeal and a motion for reconsideration.

In essence, plaintiff complains of the differential *result* that Young obtained with regard to transfer.  Although plaintiff and Young both complained of harassment, albeit of different forms, Young was able to obtain a transfer from her alleged harasser, while plaintiff was not. Again, the varying results cannot be attributed to Uecker.  Indeed, Uecker testified that he did not routinely separate employees in conflict and, as shown, he actively attempted to deny Young the accommodation afforded to her by his predecessor.  *See* Uecker Dep., 42:10-18 ("[I]t is not my normal routine to try to separate people, but rather to deal with the problem….[I]t was my trying to put [Young] back on the same tour that caused the issue.").

It is also worth noting that there are other factors that certainly could have contributed to the differing results with respect to transfer.  For example, unlike Haines, Young was supported by a union representative, Dora Everett.  *See* ECF 15, defendant's Exh. 5, ALJ's Decision, at 0039.  And, Young continued to work at FPDF pending resolution of her complaints, while Haines quit.

During the period immediately following his resignation, Haines was unable to return to work due to his stress-related medical condition.  *See* ECF 52, defendant's Exh. 18, Plaintiff's Responses to Defendant's First Requests for Admissions, No. 11 ("Plaintiff admits that on May

20, 2005, a note signed by a psychiatrist…was submitted to Jim Uecker….The note sa[id] Plaintiff was under the care of the psychiatrist who signed the note, that Plaintiff was unable to work as of that time, and that Plaintiff would be evaluated again on June 2, 2005.").  In response to Fallin's use of the phrase "reasonable accommodation" in a communique, Uecker attempted to connect plaintiff with the "reasonable accommodation committee," Uecker Dep., 38:9-17, but plaintiff refused to participate.  *See* Complaint ¶ 56.  Uecker also contacted Beverly Eckels, asking that, when Haines returned to work, she "come out and meet with the parties and try to get to the bottom of things."  *See* ECF 15, defendant's Exh. 1, Sept. 11, 2007 Trans. of EEOC Hearing, Uecker Test., at 44:13-45:2.  But, Haines never returned to work.

Plaintiff finds objectionable Uecker's explanation (in plaintiff's words) that no action would be taken "until or unless Plaintiff *resumed active employment at the FPDF with no modification in the circumstances—i.e.,* the harassment of Plaintiff by Mr. Bickford—*that had effected Plaintiff's ouster from active employment.*"  Surreply at 3 (emphasis in original).  He also notes that "Ms. Eckels' testimony indicated that she could have conducted an investigation without requiring that Plaintiff resume active employment at the FPDF."  *Id.*  In plaintiff's view, "some action could have been taken…."  *Id.* at 4.  Yet, plaintiff has not pointed to any legal authority indicating that defendant was obligated to take *any* particular action with respect to Haines's working conditions, particularly when Haines was medically prohibited from re-entering the workplace.  Had Haines argued that such an action was necessary to alleviate his medical condition, he could have requested a reasonable accommodation.  Instead, he refused to participate in that process.  *See Allen v. Pacific Bell*, 348 F.3d 1113, 1116 (9th Cir. 2003) (affirming summary judgment for defendant in a failure to accommodate case because plaintiff failed to cooperate in the interactive process).  Moreover, plaintiff would not have been in any

position to demand any particular course of action were he to have returned to work. "'An employer is not obligated to provide an employee the accommodation he or she requests or prefers; the employer need only provide some reasonable accommodation.'" *Crawford v. Union Carbide Corp.,* No. 98-2448, 1999 WL 1142346, *4 (4th Cir. Dec. 14, 1999) (citation omitted).

Furthermore, plaintiff does not point to any place in the record at which Ms. Eckels allegedly averred that "she could have conducted an investigation without requiring that Plaintiff resume active employment at the FPDF." Surreply at 3. Well over one hundred pages of Ms. Eckels's testimony appears in the record, from her deposition and the EEOC hearing. If such a statement appears in the record, the Court was unable to locate it. However, at the EEOC hearing, Ms. Eckels testified as follows:

> Q: And what if any attempt did you make to follow up after you learned that Mr. Haines had not returned to work on June 2nd--
>
> A: I didn't follow up--
>
> Q: --as I believe you testified.
>
> A: I didn't follow up in this case.
>
> Q: Did you ever hear anything further from Mr. Uecker?
>
> A: No more than Mr. Haines was not back at work.
>
>                                        ***
>
> Q: …What prevents resolution of a conflict while an employee is absent?
>
> A: You need both parties to participate to resolve the conflict. So if one party is not available then you can't get it resolved. That has to be something, a mutual resolution.
>
> Q: [Judge Norken] Well, why couldn't you have just called Mr. Haines at home?
>
> A: If Mr. Haines was under doctor's care and he wasn't--we don't normally bother someone who is under doctor's care and the doctor tells us to stay away from them. We wait until either that individual contacts us or we get--they'll submit us with something saying that we can contact that individual. The last thing we want to do is make that person stay out longer because we tried to reach him. We don't want to cause him any mental strain."

ECF 15, defendant's Exh. 2, Sept. 12, 2007, Trans. of EEOC Hearing, Eckels Test., at 89-90.

Additionally, as both Haines and Uecker are males, they are members of the same protected class. The Supreme Court has cautioned: "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)). That Haines and Uecker are members of the same protected class "'does not preclude a successful discrimination claim, [but] it substantially weakens any inference of discrimination.'" *Orgain v. City of Salisbury*, 305 F. App'x 90, 103 (4th Cir. 2008) (citation omitted). *See also Bryan v. Lucent Techs., Inc.*, 307 F. Supp. 2d 726, 739 (D. Md. 2004) (stating that the "'fact that the decision makers were of the same protected class suggests no discriminatory motivation'") (citation omitted).

In sum, no reasonable jury could find that plaintiff has established a prima facie case of discrimination on the basis of gender. Accordingly, defendant's motion for summary judgment as to Count II is granted.

### Conclusion

As the Fourth Circuit has stated, the law "does not guarantee a happy workplace, only one free from unlawful discrimination." *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997). An anti-discrimination statute is "not a general bad acts statute." *Bonds v. Leavitt,* 629 F.3d 369, 384 (4th Cir. 2011), *cert. denied sub nom. Bonds v. Sebelius,* __U.S.__, 132 S.Ct. 398. Nor is it "a general civility code for the American workplace." *Oncale, supra,* 523 U.S. at 80. Moreover, it does not "'declare unlawful every arbitrary and unfair employment decision.'" *Balazs v. Liebenthal,* 32 F.3d 151, 159 (4th Cir. 1994) (citation omitted).

For the foregoing reasons, the Court will grant the motion for summary judgment of Patrick R. Donahoe, Postmaster General of the United States (ECF 52), and deny the motion for

partial summary judgment of Elliott Haines, III (ECF 61).  A separate Order follows.


Date:   August 20, 2012                          _____/s/_____
                                                 Ellen Lipton Hollander
                                                 United States District Judge